UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JIMIEL BONNER,
        Plaintiff,


        v.                          CIVIL ACTION NO. 14-14296-MPK[1]


CAROLYN W. COLVIN,
        Acting Commissioner of
        Social Security Administration,
        Defendant.


MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION TO REVERSE OR REMAND
THE DECISION OF THE ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION (#18) AND DEFENDANT'S
MOTION TO AFFIRM THE COMMISSIONER (#21).


KELLEY, U.S.M.J.

## I. INTRODUCTION

Plaintiff Jimiel Bonner seeks reversal of the decision of Defendant Carolyn W.

Colvin, Acting Commissioner of the Social Security Administration, denying him

Supplemental Security Income ("SSI") benefits. Defendant moves for an Order

affirming her decision. With the administrative record (#14) having been filed and the

---

[1]
        With the parties' consent, this case was reassigned to the undersigned for all purposes,
including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#29.)

issues fully briefed (##19, 22), the cross motions stand ready for decision.

## II. BACKGROUND

### A. Procedural History

Bonner filed for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") in 2009 with an alleged disability onset date of August 1, 2004. (TR[2] at 147.)  The two claims were  denied at the agency level and Plaintiff requested a hearing before an administrative law judge, which was held on December 2, 2010.  *Id.*  Bonner appeared at the administrative hearing with his legal representative, and both he and a vocational expert testified before ALJ Carter. *Id.* Through his attorney, Bonner requested a closed period of disability. *Id.*

In his January 24, 2011 decision, ALJ Carter determined that Bonner was under a disability as defined by the Social Security Act from December 19, 2008 through April 22, 2010, the closed period sought, due to his back disorder and knee arthritis. (TR at 152.)  Plaintiff was found to have improved medically as of April 23, 2010 such that he then had a residual functional capacity to perform the full range of sedentary work. *Id.*  Bonner did not appeal this decision.

Plaintiff again filed for SSDI and SSI benefits in May of 2011. (TR at 212-227.) These applications were denied initially (TR at 109, 117) and again upon

---

[2]

The designation "TR" refers to the administrative record. (#7.)

reconsideration. (TR at 128, 137.)  Plaintiff sought an administrative hearing which was held before ALJ Teehan on April 11, 2013. (TR at 39-90.)  Bonner testified at the hearing, as did a vocational expert. *Id.*

ALJ Teehan issued his decision on May 31, 2013. (TR at 21-34.)  First, Plaintiff's SSDI claim was dismissed on the grounds of res judicata. (TR at 22.)  This part of the ALJ's decision has not been appealed.  Next, ALJ Teehan denied the SSI claim, concluding that Bonner had not become disabled after January 24, 2011, the date of ALJ Carter's decision.  The Appeals Council denied Plaintiff's request for review (TR at 1) which effectively rendered ALJ Teehan's decision to be the final decision of the Acting Commissioner.  Bonner then filed this civil action under 42 U.S.C. § 405(g).

## B. Factual History

### 1. Personal History

Bonner was born on May 21, 1972 (TR at 50, 111, 212) and was forty-one years of age when ALJ Teehan issued his decision in 2013.  He graduated from high school in California in 1990 (TR at 50) and has no further schooling or vocational training. (TR at 50-51.)  Plaintiff has never married, but is the father of four children. (TR at 682.)

Plaintiff's work history includes jobs working in a kitchen, as a construction

3

worker and as an auto detailer. (TR at 264.)  For about a year, 2010 into early 2011, Bonner worked approximately thirty hours per week as a self-employed landscaper and snow shoveler. (TR at 51-54.)

At the administrative hearing, Plaintiff testified that he uses public transportation.  (TR at 61.)  He visits his children "[a]t least twice a week" in Dorchester[3] (TR at 54)  and they watch movies and talk. (TR at 73.)  Bonner attended his son's football games but not "this year." (TR at 74.)

## 2. Medical History

On August 30, 2005, Plaintiff saw William Creevy, M.D., for an injury to his left shoulder. (TR at 658.)  Radiographs revealed "a type III AC dislocation" with "100 percent dissociation of the clavicle and acromion." *Id.*  The dislocation was managed non-operatively with a sling and exercises. *Id.*  At his follow-up visit approximately three months later, Bonner was observed to have "a notable deformity," but he reported "absolutely no symptoms" and expressed the belief that the "current situation is tolerable." (TR at 657.)  Dr. Creevy advised Plaintiff that his shoulder should remain asymptomatic. *Id.*

On September 25, 2008, Bonner saw Dr. Creevy for a consultation on bilateral

---

[3]

Plaintiff lives in the South End in Boston. (TR at 60.)

knee pain resulting from a fall the prior year. (TR at 649.)  Dr. Creevy diagnosed a "[p]ossible medial meniscal tear" in his left knee and ordered a new MRI for further evaluation. *Id.*  Bonner returned to review the MRI results on October 23, 2008 at which point Dr. Creevy noted "a meniscal tear on the medial side with a paramenisal cyst."  Plaintiff opted to have arthroscopic surgery to repair the tear, which surgery was performed on November 10, 2008. (TR at 644, 646.)

Bonner had an appointment with Tony Tannoury, M.D., on December 19, 2008, for lower back pain. (TR at 639-641.)  Following an examination and a review of x-rays of the lumbar spine taken that day, December 19, 2008, Dr. Tannoury diagnosed Plaintiff as suffering from "L5-S1 degenerative disc disease of the lumbar spine." (TR at 640.)  The treatment plan was for Bonner to go to physical therapy and to return in three months with an MRI of his lumbar spine. (TR at 641.)

An MRI taken on January 17, 2009 revealed "a large diffuse disc bulge and mild facet hypertrophic change at L5-S1" together with "narrowing of the lateral recesses bilaterally." (TR at 637.)  The radiologist's impression was "[d]egenerative changes at L5-S1 with narrowing of the lateral recesses bilaterally; there is possible contact of the traversing left S1 nerve root within the lateral recess by broad-based disc bulge." *Id.*  After meeting with Dr. Tannoury to discuss the MRI results, Bonner decided to undergo minimally invasive L5-S1 anterior posterior spinal fusion. (TR at

635.)

On March 10, 2009, Bonner underwent surgery for an L5-S1 anterior and posterior spinal fusion due to L5-S1 advanced degenerative disk disease. (TR at 397-399; 626-628.)  At a March 25, 2009 follow-up visit with Dr. Tannoury, Plaintiff described his back pain as "gradually improving" and that he had no pain, numbness or tingling in his legs.  (TR at 624.)

Radiographs of his right knee from April 2009 revealed that Bonner had mild medial compartment narrowing and a superolateral bipartite patella. (TR at 804.)

At a further post-surgical appointment with Dr. Tannoury on June 24, 2009, Plaintiff indicated that he had a slight tightness in the back of his thighs, but otherwise he was "happy and pleased." (TR at 805.)

On September 17, 2009, Plaintiff visited Dr. Creevy in the Department of Orthopaedics for continued diffuse pain in his right knee. (TR at 804.)

On October 14, 2009, Bonner had a follow-up visit with Dr. Tannoury during which he stated that he had stopped physical therapy due to some pain in his back. (TR at 802.)  Dr. Tannoury assessed Plaintiff with mechanical lower back pain and sent him back to physical therapy. (TR at 803.)

At a return visit with Dr. Tannoury on March 10, 2010, Bonner had no tenderness in his back and was doing "reasonably well." (TR at 793.)  However, at an

April 9, 2010 visit, Plaintiff reported that he had fallen as he left his last appointment and now he had lower back pain. (TR at 791.)  X-rays of his lumbar spine revealed that the screws were still in place. *Id.*

Plaintiff had an appointment with Dr. Creevy on April 16, 2009 for an evaluation of his right knee. (TR at 623.)  The doctor believed the localized tenderness and pain were "likely related to osteoarthritis of the knee" which was to be managed with a knee sleeve, physical therapy and Naprosyn. *Id.*  Dr. Creevy saw Bonner again on September 17, 2009 for continuing knee pain and then sent him for an MRI. (TR at 609.)

An MRI taken on September 30, 2009, revealed "[n]o evidence of acute bony, ligamentous or meniscal injury"; "edema in the lateral patellar fragment"; and "[m]ild abnormal signal in the quadriceps and patellar tendons consistent with mild enthesopathy." (TR at 483.)  Dr. Creevy discussed the results of the MRI with Bonner during a visit on October 15, 2009. (TR at 801.)  The doctor explained that the signal abnormality was consistent with tendinopathy or tendinosis and referred Plaintiff to physical therapy. *Id.*

On May 17, 2010, Bonner underwent a psychological consultative examination with Rimma Kovalcik, Psy.D. (TR at 682-685.)   Plaintiff was noted as stating, "I do have complaints.  They're not significant but I'm concerned about my mental health."

(TR at 682.)  With respect to his substance abuse history, Bonner related that he was a heavy drinker of alcohol or beer on a daily basis and that he smoked marijuana once or twice a week. (TR at 683.)  Dr. Kovalcik summarized that Plaintiff's "affect was constricted" and "[h]e was preoccupied with his physical problems and changes in his ability to function on a daily basis." (TR at 684.)   The diagnostic impression for Axis I was "substance abuse with adjustment disorder with depressed mood." (TR at 685.)

Bonner returned to Dr. Creevy on September 23, 2010 with a complaint of continuing knee pain. (TR at 790.)  After examination, the doctor recommended:

> As previously counseled, I do not think that the patient has significant abnormality or pathology within the knee which is amenable to surgery.  He probably has some degree of patellofemoral arthrosis and patellar tendonitis.  He will be managed with a knee sleeve.  I have encouraged him to work on further physical therapy.  He can use ice and anti-inflammatory medication.

*Id.*

At a December 7, 2010 office visit with Dr. Worcester, Plaintiff complained of chronic back and knee pain. (TR at 786.)

On April 21, 2011, Plaintiff had an appointment with Dr. Creevy for evaluation of his lower right extremity for complaints of discomfort in his knee, tightness, and some muscle spasms. (TR at 785.)   Dr. Creevy noted "mild discomfort on patellofemoral compression" and "a fair amount of hamstring tightness." *Id.*  The

doctor recommended that he continue with his current maintenance exercise regimen for strengthening, aerobic conditioning and stretching. *Id.*

Bonner was admitted to the Emergency Department of Boston Medical Center on April 30, 2011. (TR at 343.)  Plaintiff was complaining about back and right knee pain resulting from a fall on April 23, 2011. *Id.*  He was given a prescription for 800 mg. Ibuprofen and discharged. (TR at 347.)

Bonner complained of back spasms during an office visit with Dr. Worcester on May 24, 2011. (TR at 781.)  An MRI taken in June 2011 revealed stable post-surgical changes at L5-S1 with no significant canal or forminal compromise at any of the visualized levels. (TR at 921.)

On August 12, 2011, Bonner had an appointment with Alysia Green M.D. of the Orthopaedic Surgery Department for an evaluation of his left shoulder pain. (TR at 779.)  Plaintiff complained that recently his left shoulder had begun to bother him a little more. *Id.*  Dr. Green noted the "significant bony defect over the distal clavicle from the AC separation" as well as signs of a possible rotator cuff and labral injuries. (TR at 779-780.)  An MR arthrogram was ordered for further evaluation. (TR at 780.)

Plaintff saw Dr. Creevy again on August 18, 2011 for continued pain in his right knee. (TR at 778.)  Dr. Creevy ordered another MRI to ensure "there is no specific intra-articular pathology." *Id.*  At a follow-up appointment on September 15,

2011 to review the MRI, Dr. Creevy explained to Bonner that he had "fairly significant articular cartilage lesion at the medial femoral condyle with some delamination and fissuring." (TR at 777.)

Plaintiff had a return visit with Dr. Green on September 16, 2011 to review the MR arthrogram results. (TR at 775-776.)   The test showed no change in his acromioclavicular dislocation, no labral tears and no rotator cuff tears. (TR at 776.) Bonner did have "mild subacromial and subdeltoid bursitis." *Id.*  He was given a steroid injection for the bursitis. *Id.*

On October 24, 2011, Plaintiff underwent a right knee arthroscopy and chondroplasty, which went well. (TR at 415, 774.)  At a follow-up visit with Dr. Creevy on November 22, 2011, Bonner was given a new knee sleeve and directed to continue with his therapy. (TR at 773.)  During his next visit on December 27, 2011, Plaintiff still had some discomfort in his right knee. (TR at 772.)  Bonner returned to Dr. Creevy again on February 21, 2012, with his right knee somewhat bothersome and episodes when it gives way. (TR at 771.)  Dr. Creevy noted "moderate quadriceps atrophy," but full range of motion and no effusion.  *Id.*  Plaintiff was to continue with his therapy, and he got a refill for Motrin. *Id.*

During an office visit with Dr. Worcester on May 29, 2012, Bonner stated that his right knee was still bothering him. (TR at 767.)

10

At an office visit with Dr. Bhattacharjee on July 11, 2012, Plaintiff complained, *inter alia*, of weakness in his whole right leg which required him to use a cane to walk. (TR at 896.)  Orthopedics had noted some atrophy in his right thigh. *Id.* Although Bonner was then enrolled in physical therapy, he did not think it was helping. *Id.* In his examination, Dr. Bhattacharjee found that Plaintiff's right quad had atrophy, he was unable to flex/extend his right foot although he could move his right toes and sensation was grossly intact. (TR at 897.)  Dr. Bhattacharjee's impression with regard to Bonner's right foot drop and the fact that he dragged that foot while walking was that it was unclear whether these findings were completely neurologic or if there was a lack of effort on Plaintiff's part. (TR at 898.)  An EMG was ordered to help clarify the diagnosis. *Id.*

On October 12, 2012, Plaintiff had an office visit with Dr. Worcester as a follow-up to the EMG performed on August 6, 2012. (TR at 891.)  Bonner related that he had spoken with a neurologist and that he had an appointment for a neurological consult in November. *Id.*  Dr. Worcester noted Plaintiff had the following complaints: continuing knee pain; lower back and right hip pain; right leg feels weak so he needs to lift it with his hands; daily leg spasms and imbalance; falling frequently using a single prong cane. *Id.*  Reviewing the EMG results, Dr. Worcester wrote "[t]he mild L5, S1 radiculopathy is not likely to be the primary etiology of his right foot drop.

The patient was noted to have hyperreflexia of both lower extremities and a positive Babinski sign on the right, consistent with upper motor neuron dysfunction." *Id.* Dr. Worcester recommended Plaintiff get a four prong cane. (TR at 892.) An MRI taken in October 2012 revealed stable post-surgical changes at L5-S1 with no significant canal or forminal compromise at any of the visualized levels. (TR at 921.)

A December 2012 MRI of Bonner's spinal canal, cervical and thoracic, revealed that Plaintiff had a syrinx at the C6-7 level with no underlying mass or abnormal areas of enhancement. (TR at 918). The MRI further showed multilevel degenerative changes of the cervical spine. *Id.*

Yelena Pyatkevich, M.D., a neurologist, examined Plaintiff on December 11, 2012. (TR at 870-890.) Dr. Pyatkevich noted that Bonner had "mild back pain with radiation down the R leg" (TR at 887) and that "[t]he etiology for the progressive RLE weakness and neuropathy is not clear, but it is unlikely to be caused by LS spine disease which is mild." (TR at 889.) At visit on December 20, 2012, Dr. Pyatkevich reported:

> R leg weakness: the weakness got worse after the LS spine surgery. He blames himself because he did not rest. He stayed in the hospital only for 2 days instead of 1 week and did not let the leg to heal (sic). He feels that the weakness got even worse after R knee surgery in 2011. The current level of weakness has been since the summer of 2012, started with swelling of the foot.

TR at 884.  Plaintiff was observed to walk with a cane and a circumduction gait with the right leg. (TR at 885.)

Dr. Pyatkevich stated in a March 22, 2013 office note that Bonner had an "antalgic gait with circumduction of the RLE," that "the R leg weakness is mostly limited to HF and DF," and that "[t]he exact etiology of the weakness and loss of sensation is not clear: mostly likely a combination of prior LS spine surgery and knee surgery." (TR at 882.)

### 3. Medical Opinions

On May 17, 2010, Rimma Kovalcik, Psy.D., completed a consultative examination report on Plaintiff following a psychodiagnostic interview. (TR at 682-685.) Dr. Kovalcik related that Bonner said that his complaints were "not significant" but that he was "concerned about [his] mental health." (TR at 682.)  He has lost weight over the prior year and had "irritable mood states, poor sleep due to pain and decreased appetite." *Id.*  Plaintiff was noted to have a history of marijuana and alcohol abuse, and he smoked two packs of cigarettes every day. (TR at 683.)  Dr. Kovalcik's diagnostic impressions with respect to Axis I were substance abuse and adjustment disorder with depressed mood. (TR at 685.)

On May 21, 2010, Menachem Kasdan, Ed.D., a non-examining psychologist, completed a Psychiatric Review Technique regarding Bonner. (TR at 686-699.)  Dr.

Kasdan opined that Plaintiff's impairments were not severe, he had only a mild degree of functional limitation and no mental RFC limitation. *Id.*

In November 2011 Dr. Barbara Scolnick, a non-examining physician, completed a physical residual functional capacity assessment. (TR at 107-108.) After reviewing the record, Dr. Scolnick opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours; sit about 6 hours in an 8-hour workday; unlimited push and/or pull unless otherwise limited; occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. *Id.*

In January of 2012 Dr. Robin Tapper, another non-examining physician, agreed with Dr. Scolnick's assessment. (TR at 134-136.)

## III. THE STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social

> Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *Hill v. Colvin*, No. CIV.A. 13-11497-DJC, 2015 WL 132656, at *2 (D. Mass. Jan. 9, 2015).

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and,

15

> under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981)

(quoting *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st

Cir. 1981)). In other words, if supported by substantial evidence, the Commissioner's

decision must be upheld even if the evidence could also arguably admit to a different

interpretation and result. *See Ward v. Commissioner of Social Sec.*, 211 F.3d 652, 655

(1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

*Viveiros v. Astrue*, No. CIV.A. 10-11405-JGD, 2012 WL 603578, at *5 (D. Mass. Feb.

23, 2012). Finally,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law*, Slessinger v. Sec'y of Health & Human Servs*., 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) (citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [(D. Mass.1980)]), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001); *Roshi v. Comm'r of Soc.*

*Sec.*, No. 14-10705-JGD, 2015 WL 6454798, at *5 (D. Mass. Oct. 26, 2015).

## IV. <u>DISCUSSION</u>

In order to qualify for SSI benefits, a claimant must prove that he/she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Title 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905. In making the decision to deny Plaintiff's request for disability benefits, the ALJ conducted the familiar five step evaluation process to determine whether an adult is disabled. *See* 20 C.F.R. § 416.920(a); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982); *Veiga v. Colvin*, 5 F. Supp. 3d 169, 175 (D. Mass. 2014). The ALJ concluded that: 1) Bonner filed an application for SSI benefits on May 4, 2011; 2) Bonner had not engaged in substantial gainful activity since January 25, 2011, the alleged onset date[4]; 3) Bonner had severe impairments, to wit, degenerative disc disease of the lumbar spine with status post spinal fusion, bilateral knee degenerative joint disease with status post bilateral arthroscopies; 4) Bonner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; 5)

---

[4]

Bonner stated that he worked in 2010-2011 as a self-employed landscaper and had undeclared earnings. (TR at 29.)

Bonner  retained the following residual functional capacity:[5] only through June 20,

2012, an RFC to perform light work except he could sit for six hours in an eight hour

day, could stand for four hours in an eight hour day and could walk for four hours in

an eight hour day, could lift and carry 10 pounds frequently, lift and carry 20 pounds

occasionally, could occasionally climb stairs and ramps, could occasionally perform

balancing, stooping, crouching, kneeling and crawling, but could never climb ropes,

ladders and scaffolds.  As of July 1, 2012, an RFC to perform sedentary work except

he could sit for two hours at one time for a total of six hours in an eight hour day,

would need a sit/stand option every two hours and thus two or three times a day would

have to stand for approximately 3 minutes, could stand for one hour but for three-four

hours in an eight hour day and could walk for one hour time but could do so for three-

four hours in an eight hour workday, could frequently lift and carry less than 10

pounds and could occasionally lift and carry 10 pounds, could occasionally climb

stairs and ramps, but could never climb ropes, ladders and scaffolds, could

occasionally perform balancing, stooping, crouching, kneeling, and crawling, required

a cane to walk, could occasionally reach horizontally with his left upper extremity,

could occasionally perform gross manipulation with his left upper extremity, and

---

[5]
     A Social Security claimant's residual functional capacity ("RFC") is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular continuing basis," despite his/her mental and physical limitations. SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *see* 20 C.F.R. §§ 416.920(e) and 416.945.

could never use his right lower extremity for pushing or pulling; 6) Bonner could not perform any past relevant work; 7) considering Bonner's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform; 8) Bonner has not been under disability from January 25, 2011 through May 31, 2013, the date of the ALJ's decision. (TR at 29-40.)

Bonner takes issue with the ALJ's decision in several respects.  First, he contends that the ALJ made an improper RFC finding based on an improper credibility determination. (#19 at 14.)  Second, the ALJ is said to have made an improper RFC finding that Bonner could do light work. (#19 at 18.)  Third, Plaintiff complains that the ALJ failed to provide adequate findings for rejecting his subjective symptoms. *Id.*  Lastly, Bonner argues that the hypothetical questions to the vocation expert were legally flawed. (#19 at 19.)  Plaintiff's points will be addressed seriatim.

## A. Plaintiff's Credibility

ALJ Teehan concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (TR at 32.)  While Bonner argues this finding is not supported by substantial evidence, his contention is not persuasive.

"[T]he ALJ was not required to credit [the claimant's] testimony." *Del Rosario v. Colvin*, No. 13-30017, 2014 WL 1338153, at *7 (D. Mass. Mar. 31, 2014) (citing

*Bianchi v. Sec'y of Health and Human Servs.*, 764 F.2d 44, 45 (1st Cir.1985) (recognizing the established principle that the ALJ "is not required to take the claimant's assertions of pain at face value.")); *Tozier v. Astrue*, No. 12-10359, 2013 WL 1282371, at *4 (D. Mass. Mar. 28, 2013); *Tetreault v. Astrue*, 865 F. Supp. 2d 116, 126 (D. Mass. 2012) (an ALJ "is entitled to disbelieve subjective complaints of disabling pain in the face of contrary medical evidence."). "The First Circuit has noted that complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Ortiz v. Comm'r of Soc. Sec.*, 81 F. Supp. 3d 118, 126 (D. Mass. 2015) (internal citation and quotation marks omitted).

The regulations require that a decision regarding credibility be supported by evidence:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision . . . .
>
> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *4. Seven factors are to be considered by an ALJ:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and

> side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medication, received for relief of pain; (6) any other measures used to relieve pain or other symptoms; and (7) any other factors relating to claimant's functional limitations and restrictions attributable to pain. *See* [*Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 22 (1st Cir. 1986)]; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

*Cookson v. Colvin*, –F. Supp. 3d–, 2015 WL 4006172, at *10 (D. R.I. July 1, 2015).

While the ALJ is required to consider all of the *Avery* factors, "an ALJ is not required to discuss every factor in its decision." *Silvia v. Colvin*, No. 13-11681, 2014 WL 4772210, at *6 (D. Mass. Sept. 22, 2014); *Doshi v. Colvin*, 95 F. Supp. 3d 138, 146 (D. Mass. 2015). At bottom,

> The Court may overturn an ALJ's credibility determinations *only* when it concludes that the ALJ has ignored evidence, misapplied the law or judged medical matters that should be left to experts. The Court may also remand cases when the ALJ has provided insufficient explanations for findings or has failed to consider relevant evidence.

*Silvia*, 2014 WL 4772210, at *7 (emphasis added).

At the outset, ALJ Teehan noted that his credibility finding was based upon "the entire case record" (TR at 32); his review of Bonner's medical history and testimony was detailed and extensive. (TR at 26-29.) Considering the medical evidence, while none of Bonner's treating physicians offered opinions as to his residual functional capacity, their notes repeatedly describe Plaintiff's conditions as "mild." (*See*, e.g.,

TR at 887, 889, 891.)   The ALJ gave "evidentiary weight" to Dr. Pyackevich's opinion that Plaintiff's condition worsened during the summer of 2012 (TR at 870-890), and so included additional functional limitations in his RFC as of July 1, 2012 (TR at 31) and the second hypothetical to the vocational expert. (TR at 87-88.) Bonner was yet found to be capable of performing sedentary work.   ALJ Teehan also gave weight to Dr. Bhattacharjee's statement that it was unclear with regard to the dragging of Plaintiff's right foot whether there was a lack of effort on Plaintiff's part suggesting possible malingering.[6] (TR at 897.) The opinions of non-examining physicians support the ALJ's credibility determination in that none found Bonner to be disabled.   Plaintiff's day-to-day medications appear to be ibuprofen and motrin[7], and while the record shows that Bonner did attend physical therapy sessions off and on, he doubted their efficacy.

There is not an extensive amount of personal information about Bonner in the record, but the ALJ did review Plaintiff's testimony.   It was noted in the decision Bonner stated he did not stop his snow shoveling work, described by the vocational

---

[6]      Plaintiff complains that, in fact, no doctor concluded that he was malingering. (#17.)   That is true, but no doctor specifically ruled out the possibility either.   After all the neurological testing was done, Dr. Pyatkevich still concluded, as Dr. Bhattacharjee had, that "[t]he exact etiology of the weakness and loss of sensation is not clear." (TR at 882.)

[7]      Ibuprofen is the generic name while motrin is the brand name for the same NSAID, but both terms are referenced in the medical records.

expert as a job of heavy exertional level (TR at 85-86), until January or February of 2011. (TR at 29.) Since Plaintiff claimed to have been disabled since January 1, 2005 when applying for SSI (TR at 219), the fact that he was working at a heavy exertional job in January/February of 2011 could certainly be viewed as implicating his credibility. ALJ Teehan noted that Bonner visited with his children at least twice a week in Dorchester and that he had attended his son's football games, he can use public transportation, and that he is capable of performing some lifting, sitting, standing and walking. (TR at 32.)

While Plaintiff argues that the ALJ did not review the entire record, "the ALJ is not required to discuss every piece of evidence in the record when making his or her decision." *Nadeau v. Colvin*, No. CIV.A. 14-10160-FDS, 2015 WL 1308916, at *11 (D. Mass. Mar. 24, 2015) (citing *Santiago v. Secretary of Health and Human Services*, 46 F.3d 1114 (1st Cir.1995) and *Sousa v. Astrue*, 783 F. Supp. 2d 226, 234 (D. Mass. 2011)). ALJ Teehan was sufficiently specific in analyzing the whole record and providing justification for his findings. Those findings are supported by substantial evidence. The ALJ was well within his province in finding Bonner not entirely credible with respect to the intensity, persistence, and limiting effects of his symptoms. There is no error.

B. Improper RFC

In Plaintiff's view, ALJ Teehan's determination that he was able to do light work through June 30, 2012, was contrary to the opinion of Dr. Tapper and, consequently, had to be the result of the ALJ's own interpretation of raw medical data. Bonner's position is unavailing.

The ALJ did not improperly interpret raw medical data.  To the contrary, in concluding that Plaintiff had the ability to perform light work through June 30, 2012, ALJ Teehan incorporated the identical specific functional limitations into his RFC that Dr. Tanner incorporated into his evaluation. (*Compare* TR at 31 with TR at 134-136.) Those same precise functional limitations were included in the hypothetical question posed to the vocational expert at the administrative hearing. (TR at 86.)  It was after taking into account Bonner's detailed functional limitations that the vocational expert testified there were certain jobs in significant numbers in the economy that Plaintiff could perform. (TR at 86-87.) The DOT rating for the identified jobs was light. *Id.*

Further, both Dr. Tapper (TR at 137) and Dr. Scolnick (TR at 109) opined[8] that Plaintiff was limited to sedentary work.  Even assuming for the sake of argument that ALJ Teehan erred in finding that Bonner could do light work for a period of time, if the ALJ had found Plaintiff to be limited to sedentary work for the entire period from January 25, 2011 through May 31, 2013, he still would not have been under a

---

[8]

None of Plaintiff's treating physicians provided an RFC.

disability as defined in the Social Security Act. The vocational expert identified a significant number of jobs that Plaintiff could perform even with a more restrictive RFC. (TR at 87-89.) To the extent there was error here, it was harmless as the outcome would remain the same. *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000) ("a remand is not essential if it will amount to no more than an empty exercise"); *Martinez-Lopez v. Colvin*, 54 F. Supp. 3d 122, 135 (D. Mass. 2014).

## C. Rejection of Subjective Symptoms

Bonner's third challenge to the ALJ's decision is brief, and largely a reiteration of the first. It is argued that the ALJ "never discussed the Plaintiff's testimony regarding pain and other symptoms, with the minimum specificity required by the regulations and case law." For the reasons stated under subsection A, Plaintiff's contention is without merit.

## D. Flawed Hypothetical Questions

Lastly, Bonner complains that the ALJ did not incorporate his mental impairments, i.e., adjustment disorder and substance abuse disorder in remission, into the hypothetical questions posed to the vocational expert at the administrative hearing. The short answer is that, having failed to object during the administrative hearing, Plaintiff has waived this argument. *See Soto-Cedeno v. Astrue*, 380 F. App'x 1, 4 (1st Cir. 2010) (per curiam) ("If there was error in how the ALJ proceeded, then, [plaintiff]

has waived the defect."); *Mills v. Apfel*, 244 F.3d 1, 8 (1st Cir. 2001) (objections not presented to the ALJ are waived).  In this case, as in *Mills*, had the objection been made to the ALJ at the relevant time, in this instance during the questioning of the vocational expert at the administrative hearing, and had the ALJ agreed with the objection, the ALJ could have posed the hypothetical questions Bonner now claims could have made a difference in the vocational expert's opinion.

Even assuming, *arguendo*, that this argument has not been waived, it is without merit.  Mental limitations played a de minimis role in this case.  As noted by the Acting Commissioner, Bonner listed no mental conditions when applying for benefits (TR at 263) and qualified complaints about his mental health as being "not significant" when he was interviewed by Dr. Kovalcik. (TR at 682.)  In Dr. Kasdan's opinion, Plaintiff's impairments were not severe, he had only a mild degree of functional limitation and no mental RFC limitation. (TR at 686-699.)  When asked by the ALJ why he felt he was disabled from performing any work, Plaintiff testified about his difficulties in sitting, standing and carrying objects. (TR at 57-60.)  Bonner offered no testimony about any mental limitations at the administrative hearing. (TR at 50-84.)  The ALJ's findings that Plaintiff's mental impairments "do not cause more than minimal limitations" on his "ability to perform basic mental work activities" (TR at 25) and that those mental impairments are "nonsevere" (TR at 26) stand undisputed.

The ALJ did not err in posing hypothetical questions to the vocational expert that included only those limitations incorporated in his RFC finding. *Doshi*, 95 F. Supp.3d at 149; *Ortiz*, 81 F. Supp.3d at 128.

## V. CONCLUSION AND ORDER

For all the reasons stated, it is ORDERED that Plaintiff's Motion to Reverse or Remand the Decision of the Acting Commissioner of the Social Security Administration (#18) be, and the same hereby is DENIED.  It is FURTHER ORDERED that Defendant's Motion to Affirm the Commissioner (#21) be, and the same hereby is, ALLOWED.  Judgment shall enter for Defendant.

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge

December 17, 2015.